NOT DESIGNATED FOR PUBLICATION

No. 123,824

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of
M.S. and C.S., Minor Children.

MEMORANDUM OPINION

Appeal from Shawnee District Court; RACHEL L. PICKERING, judge. Opinion filed November 29, 2021. Affirmed.

*John Paul D. Washburn*, of Washburn Law Office, LLC, of Topeka, for appellant natural mother.

*Morgan L. Hall*, deputy district attorney, for appellee.

Before ARNOLD-BURGER, C.J., HILL and WARNER, JJ.

PER CURIAM: The district court terminated Mother's parental rights to her twin sons, M.S. and C.S. Mother appeals, arguing the court's finding that she was unfit to care for the children was not supported by sufficient evidence. She also argues that it is in the children's best interests to maintain their familial relationship with her. After carefully considering the parties' arguments and the record before us, we conclude that the district court's findings are reasonable and supported by the evidence presented. We therefore affirm the court's decision.

FACTUAL AND PROCEDURAL BACKGROUND

M.S. and C.S., twin boys, were born in September 2013 to Mother and J.S. (Father). Before the State initiated this case in June 2017, M.S. and C.S. lived in Topeka

1

with Mother, Father, and Mother's two children from a previous relationship—a son born in 2007 (Older Brother) and a daughter born in 2009 (Older Sister).

M.S. and C.S. have been the subject of multiple abuse-and-neglect investigations by the Kansas Department for Children and Families (DCF). In 2014 and 2015, DCF conducted six investigations based on a litany of allegations, including emotional and physical abuse of M.S. and C.S., drug use and neglect by Mother and Father, and all four children witnessing domestic violence by Father against Mother. These allegations, though never substantiated, led to a 2015 Child in Need of Care (CINC) case encompassing all four children.

In late June 2017, DCF received another report of possible abuse and neglect of M.S. and C.S. The report indicated that M.S. had a black eye and included concerns of drug use by Mother and Father. The night after DCF received this report, police responded to a domestic-violence incident between Father and Mother. DCF investigators interviewed Mother and all four children the next day. Investigators observed blood and bruising on Mother, and she and the children referenced violence against Mother by Father. During these interviews, investigators noticed a bruise on M.S.'s chin; Mother and the children gave differing explanations as to how it got there. Mother also agreed to take a drug test the next day but failed to complete it.

Based on the allegations of drug use and violence in the home, Mother's missed drug test, and the previous CINC case, the State filed a CINC petition on behalf of all four children two days after receiving the initial report. The court ordered that M.S. and C.S. be taken into temporary custody with DCF at the beginning of July 2017.

In the early months after her children's removal, Mother's efforts toward reintegration were lackluster. She did not communicate consistently with the agency overseeing the children's case (KVC Behavioral Health Care). She also failed to produce

2

consecutive clean urinalysis drug tests, submitting only one clean drug test between July and September 2017. As a result, KVC did not allow any visits with the children during this time.

In September 2017, Mother sought inpatient addiction treatment in Topeka—the first of three treatment attempts in this case. She only completed one day of treatment before leaving. Shortly after this attempt, Mother was evicted from her home due to complaints about Mother and Father's fights and because Father had broken windows.

Mother's second attempt at treatment came right after her eviction, in October 2017. This time, she sought treatment in Newton—away from Father—and completed 21 of 28 days. Mother left early to attend a hearing in this case.

That hearing concerned Older Brother and Older Sister. Unlike M.S. and C.S., who went into foster care, Older Brother and Older Sister had spent the three months since the CINC order with Mother's sister, and then with their father. At the hearing, the district court terminated the case as to Older Brother and Older Sister and awarded joint legal custody to Mother and their father. Since October 2017, Mother has shared custody of Older Brother and Older Sister, and the CINC case has proceeded only as to M.S. and C.S.

After losing her housing in October, Mother moved in with her grandmother. Over the next couple of months, Mother submitted enough clean drug tests to have a few supervised visits with M.S. and C.S. Still, her compliance with the required drug tests was sporadic; she failed to submit required drug tests—an action KVC considered equivalent to submitting a positive test—and she also had a true positive in November 2017. Mother also submitted a hair sample that month that KVC rejected because the sample had a falsified date.

In December 2017, after this case had been pending for six months, Mother was arrested and charged with possession of methamphetamine with intent to distribute. She was granted probation after a plea agreement with the State. Following a positive drug test in June 2019, Mother received a probation sanction; besides the sanction, Mother has not been in any other legal trouble since her arrest. Mother completed probation and was released from supervision in December 2019.

After her arrest, Mother's progress in meeting her KVC tasks for this case remained sporadic. She submitted a positive drug test in January 2018, a month after her arrest. In the period around her arrest, Mother submitted seven negative tests, missed four, and had two positives. Nevertheless, at the time, KVC's biggest concern was Mother's lack of employment and housing. KVC was also worried that Mother was still in an abusive relationship with Father; over the first six months of the case, Mother had not completed a battered women's class as requested. And when meeting with KVC in January 2018, Mother arrived with a black eye that she tried to conceal with makeup. Although Mother struggled to complete many tasks during this time, she completed a parenting class in December 2017.

M.S. and C.S. were adjudicated to be children in need of care at a combined adjudication and disposition hearing in February 2018.

When Mother's first KVC case coordinator left in May 2018—nearing a year into the case—Mother had made little progress. She had a positive hair test that month and failed to submit 13 samples during that summer. Throughout this time, Mother continued to have visits with M.S. and C.S. when she submitted two consecutive negative urinalysis drug tests.

As Mother struggled with her case tasks in 2017 and 2018, M.S. and C.S. adjusted to placement with their foster parents. M.S. and C.S. have been with their foster parents

4

since July 2017—when they were three. There are three other children in the foster parents' home with whom M.S. and C.S. have bonded over the last four years.

M.S. and C.S. have significant behavioral issues. As early as two years old, while they were living with Mother, both boys showed extreme tempers. Mother had them tested for autism, but they were too young for a conclusive determination. Although the boys are too young to diagnose mood disorders, M.S. has been on mood stabilizers, and both are on ADHD medication. The parties appear to agree that the boys' behavioral issues stem from the constant violence against Mother they witnessed at a young age.

Early in their foster placement, the twins' preschool expelled them due to their behavioral outbursts. The foster parents found a new school that would be better suited to the twins' needs. The outbursts persisted, but they slowly became less frequent and more controlled with help from teachers, counselors, and the foster parents. The school and the foster parents both wanted M.S. and C.S. to have an individualized education plan (IEP) to better help with the twins' needs, but the school required Mother's signature. There is no evidence that the school or the foster parents ever contacted Mother for this authorization; the IEP process went on hold when the COVID-19 pandemic began.

When the boys continued to have outbursts, one of the foster parents—who has a social work background—would come to the school to calm them down. The foster parents maintain a structured life for M.S. and C.S. at home and have homeschooled them during the pandemic. M.S. and C.S. know their foster parents as "Papa" and "Dad." Nobody involved in this case—including Mother—disputes that the foster parents have been positive, stable parental figures for M.S. and C.S. The twins' paternal grandfather testified that, despite his loving relationship with Mother, he felt that M.S. and C.S. should stay with the foster parents, with whom the twins have made enormous strides. And the twins' therapist testified that taking them out of the foster parents' care and away

from the stability they provide would be "devasting" for M.S. and C.S. and trigger a serious psychiatric regression.

As M.S. and C.S. adjusted to life with the foster parents, Mother began making some progress on her case tasks in summer 2018, but still struggled with drugs. Although she had both positive and missed drug tests during that time, Mother began a domestic violence class—another KVC task—in June 2018 and achieved more stable housing, living with her mother and then her uncle. Mother also found temporary employment around this time, but she lost that job when Father began calling her workplace and making threats. Father was arrested in July 2018 after Mother called the police on him, and Mother testified at the evidentiary hearing in this case that she had not seen Father since that arrest.

When Mother had visits with M.S. and C.S., they generally went well. In May 2018, staffing issues at KVC led to Maternal Grandmother overseeing visits for a few months. Mother had visits about weekly at Maternal Grandmother's house, and Mother interacted well with M.S. and C.S.

In mid-2018, Mother was hospitalized with a serious heart condition stemming from her drug use. She had "the heart of an 85-year-old" and could not stand or run for long periods of time. This health scare, along with direct orders from Mother's probation officer, prompted her to attempt inpatient treatment for the third time. In December 2018 to January 2019, Mother completed a full 28-day treatment program. Following this treatment, Mother was supposed to complete outpatient classes but only attended for a month.

Mother was also able to obtain income because of her heart condition. She applied for disability benefits in the fall of 2018 and began receiving them in March 2019. Mother has been receiving benefits since that date.

After completing treatment, Mother continued to have problems complying with drug testing. Still, she continued to visit M.S. and C.S. Mother missed two visits with the twins in April 2019—one because she overslept and one because she was in a therapy session. Mother then had a visit on May 2, 2019—her last authorized visit with M.S. and C.S in this case.

On May 6, 2019, the district court held a permanency hearing and found that Mother's progress was inadequate. Thus, it changed the case goal from possible reintegration to adoption by the foster parents. The district court also ordered that Mother could not have any more visits until she produced two consecutive clean urinalysis tests.

Over the next few months, Mother received no authorized visits, but she did see M.S. and C.S. in some unauthorized visits. In July 2019, Mother saw them at Maternal Grandmother's house after arriving unannounced. In September 2019, Mother tried to attend the twins' birthday party, but Maternal Grandmother and one of the foster parents asked Mother to leave because she was not authorized to be there. Mother became upset during this interaction but eventually left without ever seeing M.S. or C.S.

A month earlier, in August 2019, Mother had submitted another positive hair test—her last positive test in this case. In the fall of 2019, Mother produced two clean consecutive urinalysis tests and scheduled a visit with the twins. The twins' therapist, however, felt that a visit would not be a good idea because of Mother's persistent drug issues, even with the two consecutive clean tests.

The therapist—whom the foster parents hired—left a voicemail with KVC stating that it was not in the children's best interests to have visits even if Mother complied with the court's testing requirements. Mother's KVC case coordinator tried to call the therapist and sent emails to discuss the situation but never received a response. The therapist's

7

voicemail was the sole basis for suspending visits for the rest of the case. At trial, the therapist testified that she would have required six months of clean urinalysis tests to allow a visit.

Along with producing two consecutive clean urinalysis tests, Mother also obtained housing in September 2019, signing a one-year lease for an apartment. Mother became frustrated that she was not receiving visits despite complying with the district court's order and working toward a more stable situation. This led to a communication breakdown between Mother and KVC; Mother stated that she stopped submitting drug tests. She indicated at the evidentiary hearing in this case that the reason she stopped submitting tests was that she felt it would be pointless if she would not be allowed to visit the twins.

In December 2019, the State moved for a finding of unfitness and termination of parental rights. Mother submitted a final hair test in January 2020, which was negative. Mother maintains that she has been sober since September 2019—shortly after her last positive test. Mother has not been in communication with KVC since January 2020.

The district court held an evidentiary hearing over three days in August 2020. In January 2021, the court terminated Mother's parental rights. Mother appeals.

DISCUSSION

A parent has a constitutionally protected liberty interest in the relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Thus, before terminating parental rights, a district court must find the State has proven the parent is unfit, the conduct or condition that renders the parent unfit is unlikely to change in the foreseeable future, and termination of parental rights is in the best interests of the

8

child. K.S.A. 2020 Supp. 38-2269(a), (g)(1). Due to the fundamental nature of this right, any findings relating to a parent's unfitness must be proved by clear and convincing evidence. K.S.A. 2020 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

When reviewing a finding of parental unfitness, this court must determine, after considering all the evidence in a light favoring the State, whether the State proved its case by clear and convincing evidence—i.e., whether a rational fact-finder could have found it highly probable that the parent was unfit. *In re B.D.-Y.*, 286 Kan. 686, Syl. ¶ 4. We do not reweigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705.

After finding a parent unfit—both at the time of the termination hearing and for the foreseeable future—the district court must determine if termination of parental rights is "in the best interests of the child." K.S.A. 2020 Supp. 38-2269(g)(1). This assessment gives "primary consideration to the physical, mental and emotional health of the child." K.S.A. 2020 Supp. 38-2269(g)(1). Because determining what is in a child's best interests is inherently a judgment call, we will only overturn a district court's best-interests determination when it constitutes an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2. A district court exceeds the broad latitude it is afforded if it rules in a way no reasonable person would have under the circumstances, ignores controlling facts or relies on unproven factual representations, or acts outside the appropriate legal framework. *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 60, 392 P.3d 68 (2017).

Mother argues that the district court erred in finding that she is unfit to parent M.S. and C.S. and will remain so for the foreseeable future. She also asserts that it is not in the children's best interests to terminate her parental rights. Her arguments rely on the assertion that the district court improperly evaluated, or at times ignored, evidence of Mother's progress toward her three primary tasks—sobriety, housing, and income.

1. *The State proved Mother's unfitness by clear and convincing evidence.*

K.S.A. 2020 Supp. 38-2269 lists several nonexclusive circumstances that can render a parent unfit. The existence of any single factor may establish unfitness if proven by clear and convincing evidence. K.S.A. 2020 Supp. 38-2269(b)-(c), (f). The district court relied on five of these factors in its decision:

- K.S.A. 2020 Supp. 38-2269(b)(3): "the use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child";

- K.S.A. 2020 Supp. 38-2269(b)(7): "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family";

- K.S.A. 2020 Supp. 38-2269(b)(8): "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child";

- K.S.A. 2020 Supp. 38-2269(b)(9): whether the duration of the children's placement has been extended "as a result of actions or inactions attributable to the parent and one or more of the factors listed in [K.S.A. 2020 Supp. 38-2269(c)] apply"; and

- K.S.A. 2020 Supp. 38-2269(c)(3): "failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home."

For each factor, the court mainly highlighted Mother's continued drug use and delay in obtaining housing and employment.

Sufficient evidence supports the district court's findings about Mother's drug use under K.S.A. 2020 Supp. 38-2269(b)(3). There was extensive evidence of Mother's drug use throughout the three-plus years before the termination hearing. She submitted positive drug tests at various points from 2017 to 2019—with the most recent positive result in August 2019, more than six months after Mother completed drug treatment. Although Mother's most recent drug test (in January 2020) was negative, she regularly missed tests and had not been in contact with KVC for over six months at the time of the hearing.

Mother argues that the reason she did not complete the requested drug tests was not due to continued drug use, but because she was frustrated with not being permitted visits with her children even after she completed her case tasks. She maintains she has been drug-free since September 2019. But Mother raised these arguments at the evidentiary hearing, and the district court did not find these arguments persuasive. Mother essentially asks us to reassess her credibility and reweigh the evidence, which an appellate court cannot do. Instead, we consider the evidence in the light most favorable to the State to determine whether the court's decision is supported by evidence in the record.

We conclude that it is. Viewing the record in the light most favorable to the State, the evidence is such that a rational fact-finder could find it highly probable that Mother's drug use rendered her unfit under K.S.A. 2020 Supp. 38-2269(b)(3). Even if Mother is currently drug-free, extensive evidence described her drug use over the course of this case and its impact on her current ability to meet the twins' needs. The district court heard evidence on both sides of this issue and made a credibility determination against Mother. The evidence shows a high probability that Mother's drug use rendered her unfit.

The evidence also showed the effect of Mother's drug use on her ability to care for M.S. and C.S. There was extensive testimony about the issues that M.S. and C.S. experience because of the violence they witnessed at a young age. Both boys deal with posttraumatic stress because of Father, but they have made significant progress in foster care. The evidence showed that consistency is essential for the twins' continued improvement. And consistency is exactly what Mother struggled with throughout this case as she fought with addiction—she had positive tests, missed tests, missed visits, and trouble completing other tasks. Although she helps care for Older Brother and Older Sister, they do not have the behavioral issues that M.S. and C.S. do, and they also have a father who has cared for them when Mother could not. Thus, because of the continual failed drug tests and missed urinalysis tests over more than three years, coupled with the special needs of M.S. and C.S., the district court properly found unfitness under K.S.A. 2020 Supp. 38-2269(b)(3). That finding alone is sufficient to support the district court's decision. See K.S.A. 2020 Supp. 38-2269(f).

Because Mother's drug use under the first factor is sufficient to uphold the district court's decision, we need not discuss the other factors the court considered at great length. We note, however, that Mother's drug use was also a significant consideration for the district court's findings under the remaining factors—lack of effort to adjust her circumstances, the children being in extended placement because of Mother's inaction, and failure to carry out a reintegration plan. For the same reasons as the first factor, the evidence of Mother's drug use is also sufficient to show a high probability that she is unfit under these factors.

We agree with Mother that the district court's findings about housing and income contained a few factual errors. For example, the court found that Mother failed to obtain housing or income until early 2020, but the record shows that she obtained both several months earlier. We are not convinced, however, that either of these factual misstatements had a meaningful impact on the district court's primary concern—Mother's continued

12

drug use. And even using the timeframe that Mother proposes in her brief, the fact remains that she failed to secure housing or income for years while her children remained in foster care. While we appreciate the strides Mother states she has made in the last couple of years, there is nevertheless sufficient evidence in the record to support the district court's finding of unfitness.

After making an unfitness determination, a district court must determine whether a person's unfitness as a parent is likely to change in the foreseeable future. K.S.A. 2020 Supp. 38-2269(a). A court evaluates "foreseeable future" from a child's perspective because children have a different perception of time. *In re R.S.*, 50 Kan. App. 2d at 1117. For a child, "a month or a year seem[s] considerably longer than it would for an adult." *In re M.S.*, 56 Kan. App. 2d 1247, 1263, 447 P.3d 994 (2019); see K.S.A. 2020 Supp. 38-2201(b)(4). A court can look to a parent's past conduct as a predictor of the foreseeable future. 56 Kan. App. 2d at 1264; *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982).

Here, the record supports the district court's finding that Mother's unfitness is unlikely to change in the foreseeable future. For this finding, the district court relied almost entirely on Mother's past conduct—both the previous CINC case and Mother's struggles throughout the current case. Mother was unreliable with her drug testing for multiple years, and she submitted positive tests after she went to treatment. Mother may have finally turned the corner at the time of trial; the evidence showed that she submitted some negative tests, and Mother testified that she had no contact with Father, stopped using drugs, and helped care for Older Brother and Older Sister. But again, the district court was not persuaded that Mother would be a fit parent and provide a stable home for M.S. and C.S. We do not reassess credibility or reweigh evidence.

M.S. and C.S.'s perception of time—and the duration of this case—was also important to the district court's findings. Mother argues that the therapist's actions (telling

KVC not to allow visits even after she complied with drug-testing requirements and obtained housing and income) prevented her from reintegrating and showing that her fitness was likely to change. The district court did not find this explanation credible. But even if it were, the therapist's actions occurred over two years into the case, during which Mother missed or submitted positive drug tests and demonstrated half-hearted compliance with other reintegration tasks.

There was sufficient evidence to show a high probability that Mother's unfitness is unlikely to change in the foreseeable future. From the children's perspective, this case has languished for over half of their lives, and Mother struggled with drugs for much of it, despite treatment attempts. The district court weighed all this evidence before deciding Mother's unfitness was unlikely to change in the foreseeable future. Sufficient evidence supports the district court's finding that Mother's unfitness is unlikely to change in the foreseeable future.

2. *The district court did not abuse its discretion when it found that terminating Mother's parental rights is in the children's best interests*.

The district court did not abuse its discretion when it found that terminating Mother's parental rights was in the best interests of M.S. and C.S. The court noted that taking M.S. and C.S. out of the structure provided by their foster parents would hurt them. Extensive testimony showed how critical consistency is for both boys, and there is no question that the foster parents provide that. Taking them out of the foster home would risk undoing the last four years of behavioral progress.

We recognize that Mother continues to have shared custody of Older Brother and Older Sister. But the status of those children, who also have the support of their father and other family, is not before us. Considering this case's history and dynamics, the district court did not abuse its discretion when it found termination of Mother's parental rights to be in the children's best interests.

14

Affirmed.